IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Cindy L. Dolan,                               :
                    Plaintiff          :       Civil Action 2:10-cv-00988

       v.                                 :       Judge Watson

Michael J. Astrue,                            :       Magistrate Judge Abel
Commissioner of Social Security,
                Defendant           :

### REPORT AND RECOMMENDATION

Plaintiff Cindy L. Nolan brings this action under 42 U.S.C. §§405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security denying her application for  Disability Insurance Benefits and Supplemental Security Income benefits.  This matter is before the  Magistrate Judge for a report and recommendation on the parties' cross-motions for summary judgment.

**Summary of Issues.**

Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- The administrative law judge committed reversible error in refusing to give controlling weight or at least "great weight" to the opinions of the treating doctors; and,
- The administrative law judge improperly assessed plaintiff's credibility.

**Procedural History.**  Plaintiff Cindy L. Nolan filed her application for disability insurance benefits on October 20, 2004, alleging that she became disabled on October 1, 2003, at age 45, by chronic pain with fibromyalgia, asthma, emphysema, migraines,

thyroid condition, mild heart murmur, irregular blood pressure, knee and back problems.  (R. 398-400, 63.)  The application was denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge. On May 7, 2008, an administrative law judge held a hearing at which plaintiff, represented by counsel, appeared and testified.  (R. 434.)  A vocational expert and a medical advisor also testified.  On June 25, 2008, the administrative law judge issued a decision finding that Nolan was not disabled within the meaning of the Act because she retained the ability to perform a reduced range of jobs having light exertional demands. (R. 28.)  On September 15, 2010, the Appeals Council denied plaintiff's request for review and adopted the administrative law judge's decision as the final decision of the Commissioner of Social Security.  (R. 6-8.)

**Age, Education, and Work Experience.**  Cindy L. Nolan was born August 3, 1957.   (R. 398.) She has a high school education and completed one year of college.  She also completed adult education classes in clerical work.  (R. 69.)  She has worked as a clerical worker, a manager at an automobile dealership, and as a sales person.  She last worked May 7, 2004., when she was laid off due to company cutbacks. (R. 54.)

**Plaintiff's Testimony.**  The administrative law judge summarized Nolan's testimony as follows:

> The claimant testified that migraines and fibromyalgia keep her from working. Her fibromyalgia is very painful even with medication. Her pain affects her shoulders, low back, and thighs. It feels like a knife is being put into her. Her legs swell every once in awhile, and she has difficulty concentrating. She has to lie down to eliminate the pain. She might be able

2

to walk one day for 30 minutes but the next day might be for 15 minutes, each day is different.

The claimant additionally stated that her headaches have been occurring every week for the past couple of months. They occur every time she gets stressed. Her headaches feel like a mask is around her eyes and temples and then goes like a tight rubber band around her head. These headaches can last for two to three days. To relieve the headaches she takes allegro and Tylenol and then lies down with a cold washcloth in her head.

The claimant also noted that her urinary incontinence is better with medication She also gets real dizzy when standing up, and she would have to sit back down. She also has a trigger finger if she does something for a long period of time.

(R. 25-26.)

**Medical Evidence of Record.**  The administrative law judge's decision fairly sets out the relevant medical evidence of record.  This Report and Recommendation will only briefly summarize that evidence.

Adena Health System. On September 24, 2003, plaintiff had a chest x-ray based on complaints of dyspnea. The x-ray revealed no active cardiopulmonary pathology. (R. 178.) On November 7, 2003, plaintiff underwent a spect cardiolite of her heart because of complaints of chest pain. The resting images showed no evidence of defect. (R. 177.)

A dobutamine cardiolite pharmacological stress study was performed. Plaintiff's heart rate increased to 89% of her age predicted maximum hart rate of 174 and achieved a double product of approximately 19,840. She had no clinical angina, but she had transient nausea, which is a typical side effect of dobutamine. The electrocardiogram portion of the study was negative for ischemia. (R. 179-80.)

On December 19, 2003, plaintiff underwent right and left heart catheterizations. (R. 183-85.) Plaintiff had normal left ventricular end diastolic pressure consistent with complaint left ventricle. There were normal right heart pressures. The right coronary dominant system had normal appearing epicardial coronary arteries.  (R. 185.)

On November 6, 2007, plaintiff underwent a laparoscopic-assisted vaginal hysterectomy and salpingo-oophorectomy. (R. 369-79.)

Southern Ohio Cardiology Associates, Inc.  On November 17, 2003, S. B. Patel, M.D., a cardiologist, evaluated plaintiff for complaints of chest tightness and shortness of breath. Her symptoms mostly occurred on exertion and lasted a few minutes after she stopped exerting herself.  Dr. Patel noted that although Nolan did not have any significant risk factors for coronary disease, her symptoms were suspicious for angina. He recommended that she undergo a pharmacologic stress test because she had not completed the treadmill exercise test. (R. 189-91.) On December 9, 2003, Joseph Ghazal, M.D., recommended that plaintiff undergo heart catheterization because of her continued complaints of chest pain and shortness of breath. (R. 187-88.)  On January 12, 2004, Dr. Patel indicated that from a cardiovascular standpoint, plaintiff was fairly stable. (R. 186.)

Robert Harris, D.O. A May 8, 2004 CT scan of Nolan's abdomen showed minor non-specific right basilar atelectatic streak. There was no acute abnormality in the abdomen or pelvis. (R. 288.)

4

<u>John F. Seidensticker, M.D.</u> On June 9, 2004, Nolan underwent a thyroid uptake study and scan. There was evidence of a hypointense nodule in the inferior aspect of the right lobe. (R. 200.) On July 7, 2004, Dr. Seidensticker examined plaintiff. Nolan reported that in 1990 she had thyroid enlargement and underwent a subtotal thyroidectomy, She has been on thyroid medication since that time. Her current dose of Synthroid was 25 micrograms daily. Nolan reported being tired, short of breath, and sweaty. Her medical history included the onset of migraines at age 16, asthma, reflux symptomatology. She also reported neck, back, and knee pain. On physical examination, Nolan was in no acute distress. Dr. Seidensticker described her overall appearance as one of fair health. Her recent TSH level was normal. A recent thyroid uptake and scan showed evidence of a hypointense nodule in the inferior aspect of the right lobe of the thyroid gland. Dr. Seidensticker recommended that plaintiff receive an ultrasound of the thyroid gland. (R. 195-97.)

On July 15, 2004, plaintiff had a thyroid ultrasound which revealed a hypoechoic nodule within the left lobe of the thyroid of uncertain significance. (R. 199.)

On July 19, 2004, Dr. Seidensticker examined plaintiff. A recent ultrasound revealed a 1 centimeter hypoechoic, but solid, nodule within the mid pole of the left thyroid gland. Her total thyroid size was normal. Nolan reported that this was not a good day. A current TSH was 6.64, and Dr. Seidensticker noted that the 25 micrograms of Synthroid was not adequate. He increased her dose to 50 micrograms daily.

<u>Cathy A. Bishop, D.O.</u> On July 29, 2002, Dr. Bishop performed a complete physical examination. No acute issues were identified. (R. 270.)

On September 24, 2003, plaintiff complained of swelling all over and retaining fluid. Previous lab work had not shown any evidence of kidney dysfunction. (R. 264.)

On October 7, 2003, Dr. Bishop noted that plaintiff was recently diagnosed with edema and polymyalgias and arthralgias. Plaintiff was having persistent edema and an elevated sed rate. Dr. Bishop wanted to rule out a connective tissue disorder. (R. 263.) On January 14, 2004, Dr. Bishop gave Nolan samples of Relpax for her migraines. Plaintiff reported persistent shortness of breath with hypothyroidism. (R. 261.)  On February 16, 2004, Dr. Bishop indicated that the Relpax seemed to alleviating plaintiff's migraines. On March 24, 2004, plaintiff complained of fluid retention. (R. 259.) On April 7, 2004, plaintiff reported recurrent palpitations and chest pain. (R. 258.) On May 6, 2004, plaintiff had persistent water retention, mild shortness of breath, and bloating in her abdomen. Nolan appeared mildly edematous in her face, abdomen, and legs.  Dr. Bishop referred her for a CT scan of abdomen. (R. 257.) On July 6, 2004, Dr. Bishop noted that plaintiff had significant problems with pain and swelling. (R. 256.)

On August 19, 2004, Nolan presented at Dr. Bishop's office with increasing shortness of breath, dizziness, and was orthostatic with systolic blood pressure at 82. Plaintiff reported having more problems with her lower back. Her breathing had become more labored. She had been diagnosed with early emphysema by pulmonary function testing, and overall she had been feeling poorly. She was experiencing a lot of

6

bloating in her abdomen. Plaintiff was admitted to the hospital for monitoring, getting her blood pressure under control, watching her blood sugar, getting fluid off of her, and checking her abdominal situation. (R. 205-06.) Plaintiff was discharged on August 22, 2004 in stable condition. A CAT scan of her head was negative. An upper GI was also negative. She had normal carotids. (R. 203-04.)

On August 30, 2004, Nolan was seen after her hospitalization for chronic obstructive pulmonary disorder, shortness of breath, and irritable bowel. She continued to have abdominal discomfort with intermittent diarrhea. (R. 254.) On October 20, 2004, plaintiff reported persistent fatigue, which Dr. Bishop opined was most likely secondary to fibromyalgia. Dr. Bishop indicated that she wanted plaintiff to begin an exercise regimen. (R. 253.)

In an April 21, 2005 letter to plaintiff's attorney, Dr. Bishop noted that she had treated plaintiff for thyroid tumors and cysts, hypothyroidism, gastroesohageal reflux disease, heart palpitations and panic attacks, recurrent migraines, fibromyalgia type pain, asthma, chronic sinusitis, persistent edema, and leg weakness. Dr. Bishop opined:

> I believe that Cyndi is at the point where she has multiple subjective complaints that have led her to be unemployable for several reasons. Number one, she has multiple areas of tenderness both in the joints and the muscles. She has pretty extreme edema to her legs that gets worse when she sits. She has also worsening problems with headaches and sinuses to the point where she does not function well. On physical examination, Cyndi has the above findings, as well as a depressed mood. Her affect, although appropriate, is slightly flattened and depressed. She has pretty dramatic edema to her legs and she has a lot of puffiness around her face. Her neck shows possible signs of enlarged thyroid. Cardiac wise, there are no extreme or abnormal findings. Her lungs are

> essentially clear, unless she has an exacerbation of her asthma, which comes frequently with the sinusitis. Her abdomen is slightly descended and tender. She has multiple sites of myalgias and arthalgias with palpation, particularly around her shoulders, hips, lower back and lower extremities. These have been findings for a number of years and again we have tried many medications, therapies and even specialty referrals without much success.

(R. 250.) Dr. Bishop also completed a medical findings questionnaire. She indicated that plaintiff had chronic back and leg pain, asthma, arthritis, and hypothyroidism. Dr. Bishop opined that plaintiff could not walk a city block without rest. She could sit for 30 minutes at a time and stand for 15 minutes at a time. She could sit for a total of 4 hours in a day. She could stand and/or walk for a total of 4 hours in a day. She could never lift and/or carry weight in a competitive work environment. Nolan could occasionally bend and climb stairs, but she could never squat, crawl, or climb ladders. She could reach above shoulder level. She should avoid dusts, flames, perfumes, and smoke. Her pain, fatigue, and other symptoms would constantly interfere with her attention and concentration. Dr. Bishop first examined plaintiff on June 18, 1997. (R. 248-49.)

On May 17, 2005, Nolan complained of persistent headaches, elevated blood pressure, and recurrent chest discomfort. Dr. Bishop believed that the chest pain could be related to her hypothyroidism. She continued to have edema in her legs causing difficulty with range of motion. (R. 247.) On July 11, 2005, plaintiff reported increased palpitations, shortness of breath, and chest discomfort. (R. 244.)

On September 14, 2005, Nolan had numerous complaints including abdominal pain, change in stools, chest pain, dizziness, and headaches. Dr. Bishop indicated that

8

she had had numerous work ups, but she had not found any significant problems. Nolan reported that her headaches were severe. Dr. Bishop referred Nolan for an MRI and for a scope. (R. 243.)

On January 25, 2006, plaintiff reported a 9-day history of constipation. She had had significant nausea and one episode of vomiting. She reported a lot of abdominal pain. Dr. Bishop believed that the Vicodin could be causing the constipation. (R. 241.) On May 15, 2006, plaintiff reported continued abdominal pain. (R. 236.) On May 25, 2006, plaintiff reported persistent back and chest pain. She had had multiple tests, including an endoscopy, colonoscopy, and MRIs, without any significant findings. Dr. Bishop referred plaintiff for another CAT scan. (R. 235.) On July 19, 2006, plaintiff complained of persistent numbness and tingling in her right arm and face for the past few weeks. Dr. Bishop believed that this might be caused by Lyrica and instructed her to reduce her dose. Plaintiff was tired all the time, although she had no chest pain, shortness of breath, nausea, vomiting, fevers, or chills.

Martin Fritzhand, M.D. On February 8, 2011, plaintiff underwent pulmonary functioning testing. Plaintiff exhibited mild combined obstructive and restrictive pulmonary disease with a bronchospastic component. (R. 215-16.)

William Kelley, M.D. On March 1, 2005, Dr. Kelley a state agency physician, completed a physical residual functional capacity assessment. (R. 224-31.) Dr. Kelley opined that plaintiff could occasionally lift and/or carry 50 pounds and frequently lift and/or carry 25 pounds. She could stand and/or walk for a total of about 6 hours in an

9

8-hour workday. She could sit for about 6 hours in an 8-hour workday. She was unlimited in her ability to push and/or pull. She could never balance. She also should avoid concentrated exposure to fumes, odors, gases, and poor ventilation and all exposure to hazards.

On June 2, 2005, W. Jerry McCloud reviewed the evidence of records and Dr. Kelley's assessment and concurred in his findings. (R. 231.)

On September 21, 2005, x-rays of plaintiff's thoracic and lumbar spines were taken. There was evidence of disk space narrowing at multiple levels of plaintiff's thoracic spine. There was a mild degree of disk space narrowing at the L2-L3 level of plaintiff's lumbar spine. (R. 278.) A MRI of plaintiff's thoracic spine indicated that plaintiff's disk space heights were relatively well maintained. There was no evidence of herniated nucleus pulposus. There was no evidence of spinal stenosis, and no acute abnormality was seen. (R. 277.) An October 11, 2005 MRI of Nolan's brain was unremarkable. (R. 276.)

A May 30, 2006 CAT scan of plaintiff's abdomen and pelvis showed cystic enlargement of the left ovary. There was also a tiny amount of free fluid within the pelvis. (R. 273.)

Herbert M. Sinning, M.D. On September 16, 2005, Dr. Sinning evaluated plaintiff following a referral from Dr. Bishop based on a change in bowel habits with intermittent rectal bleeding. Nolan also complained of epigastric abdominal pain and a previous diagnosis of GERD. On examination, plaintiff was diffusely tender in all four

quadrants of the abdomen, but there was nothing specific.  The rest of her physical examination was within normal limits. (R. 315.) An October 18, 2005 colonoscopy was normal. There was significant gastric irritation with regenerative changes and multiple polyps related to chronic inflammation. (R. 309-12.)

James Folk, M.P.T. On October 25, 2005, Mr. Folk completed a functional capacity evaluation. Nolan reported that she was diagnosed with fibromyalgia in 2004. She stated her pain ranged from a 3 to a 10 on a ten-point scale. Mr. Folk concluded that Nolan had the ability to work at the sedentary strength range. She could not work at the light strength range because she could not remain on her feet for six out of eight hours. She was unable to lift at any height on a frequent or constant basis. Nolan had limited mobility in her cervical spine, shoulders, lumbar spine, hips, and knees, which restricted various types of employment. Given her frequent need for rest breaks and shortness of breath during testing, Mr. Folk assumed her endurance was poor. (R. 316-17.)

Jennifer Dewar, M.D. On January 24, 2007, Dr. Dewar began treating plaintiff for her multiple chronic medical problems. Nolan described her pain as being located from head to toe, specifically in her neck, back, arms, leg, and stomach. When she was inactive, her pain was a 3 or 4 on a ten-point scale, but if she attempted to do dishes or engage in household cleaning, it rose to a 9. Nolan said that her pain was well-controlled on her current medication regimen. She reported that she slept well at night. Nolan had a history of migraines, and she experienced symptoms two times per month.

11

She also reported a history of depression and anxiety. She took Zoloft, which controlled her symptoms. Nolan also reported hypothyroidism and a history of urinary incontinence due to a prolapsed bladder. Dr. Dewar diagnosed fibromyalgia, hypothyroidism, and urinary incontinence. (R. 321-23.)

On February 19, 2007, Dr. Dewar examined plaintiff for follow up care of chronic pain secondary to fibromyalgia. (R. 348-49.) On March 21, 2007, plaintiff reported that her pain was a 3 on a ten-point scale. (R. 346-47.) On May 9, 2007, plaintiff reported midepigastric abdominal pain. (R. 343.)

On December 18, 2007, Dr. Dewar completed a fibromyalgia residual functional capacity questionnaire. Dr. Dewar first examined plaintiff in January 2007 and has seen her every three months thereafter. Nolan had been seen at her practice since 1996. Nolan was diagnosed with migraine headaches, irritable bowel syndrome, osteoarthritis, hypothyroidism, GERD, depression, anxiety, asthma, and COPD. Nolan's prognosis was fair. Dr. Dewar noted that plaintiff had multiple tenderpoints. Other symptoms included nonrestorative sleep, chronic fatigue, morning stiffness, muscle weakness, irritable bowel syndrome, frequent, severe headaches, numbness and tingling, breathlessness, anxiety, depression, and hypothyroidism. Nolan was not a malingerer. Emotional factors contributed to plaintiff's symptoms. Plaintiff experienced daily pain. Medicated, plaintiff rated her pain as a 4 out of 10; without medications, her pain was a 10. Dr. Dewar opined that plaintiff was incapable of even low stress work. Side effects from her medications included drowsiness. Plaintiff could only walk one

12

block before experiencing severe pain or requiring rest. She could not sit more 30 minutes at a time or stand for more than 30 minutes at a time. She could only sit or stand/walk for about 2 hours in an 8-hour day. Dr. Dewar indicated that plaintiff needed to walk for five minutes every hour.  Plaintiff required 5-10 minute breaks every 30-45 minutes. Plaintiff could occasionally lift 10 pounds or less. She had significant limitations in repetitive reaching, handling, or fingering.  Plaintiff would likely be absent from work more than four times a month. (R. 391-95.)

Siyun Li, M.D. On July 24, 2006, Dr. Li, a neurologist, examined plaintiff based on her complaints of constant headaches and intermittent right-sided numbness. She experienced numbness in her arm and leg and a tingling sensation in her left eye and face. These symptoms lasted for about ten minutes and were followed by constant headache lasting 45 minutes to 1 hour. She reported a history of migraines and positional vertigo. Plaintiff's MRI of the brain was normal. Dr. Li diagnosed basilar migraine. He prescribed Topamax. (R. 338-40.) On October 23, 2006, Dr. Li indicated that her headaches occurred less frequently, and her headaches were not as strong. She denied having side effects from the Topamax. (R. 336-37.) On January 20, 2007, Dr. Li noted that plaintiff Bishop "responded well with Topamax." (R. 333.) Since her last visit, Bishop had "three bad headaches" that "were somewhat prolonged lasting 3 to 4 days but they were all similar quality." *Id.* She denied dizziness or other symptoms. *Id.* A neurological examination was unremarkable. Dr. Li's impression was that Bishop's basilar migraine headaches were "well controlled with Topamax." (R. 334.)

13

On February 8, 2007, Dr. Li completed a headaches residual functional capacity questionnaire. (R. 327-32.) He had examined plaintiff three times since February 2006 and diagnosed her with basilar migraines. Nolan experienced headaches three times per week. Other symptoms included vertigo, nausea and vomiting, photosensitivity, and paresthesia. Nolan's headaches lasted for about one hour. The headaches had improved since taking Topamax. (R. 328.) But although the frequency of the headaches had lessened their duration was longer. Dr. Li indicated that emotional factors somewhat impacted the severity of her headaches, but her impairments were reasonably consistent with her symptoms and functional limitations. (R. 330.) Dr. Li opined that plaintiff was precluded from performing even basic work activities.  Nolan would be required to take unscheduled breaks lasting for two to three hours during an 8-hour workday two to three times per month. Dr. Li believed that plaintiff was capable of low stress jobs. Her impairment was likely to cause "good days" and "bad days," and she would likely be absent from work two days per month. (R. 331.)

On May 13, 2007, Dr. Li wrote to Dr. Bishop that Nolan had three headaches since her last visit (January 20, 2007), but they were less severe. (R. 367.) Dr. Li said the migraines were well controlled with Topamax. (R. 368.) On September 10, 2007, Nolan reported only two headaches since her May visit. They were "short lasting but more severe" and were associated with dizziness. (R. 364.) Dr. Li's impression was that the basilar migraine headaches were "well controlled with Topamax." (R. 365.)

On January 7, 2008, Dr. Li completed a medical questionnaire indicating that Nolan suffered from complicated migraines and as a result was likely to miss four or more days of month of work. She would need unscheduled work breaks 2-3 days a month and would need to rest for up to 2-3 days before returning to work. (R. 397.)

On March 2, 2009, Dr. Li wrote to Dr. Dewar that Nolan was complaining of daily headaches. Over the course of treatment, the pattern of plaintiff's headaches had changed. Her symptoms were now less severe, but her headaches were more persistent. An MRI was essentially normal. (R. 425.) Dr. Li said that Nolan's basilar headaches had improved with Topamax. Her chronic daily headaches were likely rebounding head-aches. (R. 426.)

Dino DeLaurentis, D.O. On May 16, 2007, Dr. DeLaurentis, a urologist, examined plaintiff and diagnosed mixed urinary incontinence, history of irritable bowel syndrome, history of fibromyalgia, and possible interstitial cystitis. (R. 361.)

**Administrative Law Judge's Findings.**

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

2.    The claimant has not engaged in substantial gainful activity since April 21, 2005, the amended alleged onset date (20 CFR 404. 1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: fibromyalgia; migraine headaches; obesity (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or equals one of the listed impairments in

20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work with standing/walking 2 hours at a time–6 hours a day; no limitation on sitting; and no climbing ladders or working at unprotected heights, around moving machinery, with exposure to temperature and humidity extremes, and with exposure to dust, fumes, and gases. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds (20CFR 404.1567(b) and 416.967(b)).

6. The claimant is capable of performing past relevant work as an administrative assistant, a store manager, and general clerk, a bookkeeper, a typist, a file clerk, a retail sales person, and a sales representative. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from April 21, 2005 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(R. 21-27.)

**Standard of Review**.  Under the provisions of 42 U.S.C. §405(g), "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'"  *Id*.  *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366

16

(6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining

whether the Commissioner's decision is supported by substantial evidence, the Court

must "'take into account whatever in the record fairly detracts from its weight.'"  *Beavers*

*v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)(quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and*

*Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments.**   Plaintiff argues that the decision of the Commissioner

denying benefits should be reversed because:

- The administrative law judge committed reversible error in refusing to
    give controlling weight or at least "great weight" to the opinions of the
    treating doctors. Plaintiff argues that the administrative law judge failed
    to give any reason for rejecting the opinion of Dr. Li. Plaintiff maintains
    that the administrative law judge provided an unsupported explanation
    as to why Dr. Dewar's opinion fails to meet the three prong test of the
    treating physician rule. The administrative law judge incorrectly stated
    that plaintiff's medical records do not show that she had trigger points
    indicative of fibromyalgia. Nolan relies on Dr. Dewar's December 23, 2009
    treatment note indicating that plaintiff had 12 tender points of
    fibromyalgia. *See* R. 413. Plaintiff maintains that Drs. Dewar and Li have
    an extensive treatment relationship with plaintiff lasting numerous years.
    Drs. Dewar and Li examined her and referred her to testing and other

17

specialists. Plaintiff further maintains that the opinions of Drs. Dewar and Li are consistent with the remaining record. The only inconsistent evidence is the testimony of Dr. Nusbaum, the medical expert, who gave flawed testimony. Plaintiff argues that Dr. Nusbaum mischaracterized Dr. Li's records. Although plaintiff's headaches were less severe, they were more frequent. Despite improvement of her basilar migraines with Topamax, Nolan still had chronic daily rebound headaches. On January 7, 2008, Dr. Li noted that Nolan continued to suffer from complex migraines and would be absent four or more times because of her migraines. Although her headaches were short, they were severe.

- <u>The administrative law judge improperly assessed plaintiff's credibility</u>. The administrative law judge discredited plaintiff based on her assertion that her pain was well-controlled on January 20, 2007 and that in February 2007 she stated she was not experiencing any side effects from her medications. The administrative law judge concluded that these statements contradicted her complaints of pain and other symptoms.  Dr. Li stated, however, that plaintiff would have both good and bad days. In the January 24, 2007 medical report, plaintiff was not referring to her migraine headaches, and lack of side effects does not support a finding that her complaints of pain from migraine headaches is not credible. The administrative law judge failed to note that Nolan had a strong work

history that should have been considered in her favor when assessing her credibility. Nolan has been compliant with her treatment and shown a willingness to improve her conditions.

**Analysis.**  Treating Doctors' Opinions.  Plaintiff argues that the Administrative Law Judge erred in rejecting the opinions of Drs. Dewar and Li that plaintiff's impairments precluded work activity.

Treating Doctor: Legal Standard.  A treating doctor's opinion[1] on the issue of disability is entitled to greater weight than that of a physician who has examined plaintiff on only one occasion or who has merely conducted a paper review of the medical evidence of record.  20 C.F.R. § 404.1527(d)(1).  *Hurst v. Schweiker*, 725 F.2d 53, 55 (6th Cir. 1984); *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048, 1054 (6th Cir. 1983).  The Commissioner's regulations explain that Social Security generally gives more weight to a treating doctors' opinions because treators are usually "most

---

[1]The Commissioner's regulations define "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 404.1527(a)(2). Treating sources often express more than one medical opinion, including "at least one diagnosis, a prognosis and an opinion about what the individual can still do." SSR 96-2p, 1996 WL 374188, at *2. When an administrative law judge fails to give a good reason for rejecting a treator's medical opinion, remand is required unless the failure does not ultimately affect the decision, *i.e.,* the error is *de minimus. Wilson,* 378 F.3d at 547. So reversible error is not committed where the treator's opinion "is patently deficient that the Commissioner could not possibly credit it;" the administrative law judge's findings credit the treator's opinion or makes findings consistent with it; or the decision meets the goal of 20 C.F.R. § 1527(d)(2) but does not technically meet all its requirements. *Id.*

19

able to provide a detailed, longitudinal picture" of the claimant's medical impairments. 20 C.F.R. § 404.1527(d)(2).  When the treating doctor's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record" the Commissioner "will give it controlling weight. " *Id.*

Even though a claimant's treating physician may be expected to have a greater insight into his patient's condition than a one-time examining physician or a medical adviser, Congress specifically amended the Social Security Act in 1967 to provide that to be disabling an impairment must be "medically determinable."  42 U.S.C. §423(d)(1)(A). Consequently, a treating doctor's opinion does not bind the Commissioner when it is not supported by detailed clinical and diagnostic test evidence.  *Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir. 2004); *Varley v. Secretary of Health and Human Services,* 820 F.2d 777, 779-780 (6th Cir. 1987); *King v. Heckler,* 742 F.2d 968, 973 (6th Cir. 1983); *Halsey v. Richardson,* 441 F.2d 1230, 1235-1236 (6th Cir. 1971); *Lafoon v. Califano,* 558 F.2d 253, 254-256 (5th Cir. 1975).  20 C.F.R. §§404.1513(b), (c), (d), 404.1526(b), and 404.1527(a)(1)[2].

---

[2]Section 404.157(a)(1) provides:
You can only be found disabled if you are unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. See §404.1505. Your impairment must result from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. See §404.1508.

The Commissioner's regulations provide that she will generally "give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." 20 C.F.R. § 404.1527(d)(1). When a treating source's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 404.1527(d)(2). In determining the weight to assign a treating source's opinion, the Commissioner considers the length of the relationship and frequency of examination; nature and extent of the treatment relationship; how well-supported the opinion is by medical signs and laboratory findings; its consistency with the record as a whole; the treating source's specialization; the source's familiarity with the Social Security program and understanding of its evidentiary requirements; and the extent to which the source is familiar with other information in the case record relevant to decision. *Id.* Subject to these guidelines, the Commissioner is the one responsible for determining whether a claimant is disabled. 20 C.F.R. § 404.1527(e)(1).

Social Security Ruling 96-2p provides that "[c]ontrolling weight cannot be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques." Consequently, the decision-maker must have "an understanding of the clinical signs and laboratory findings and what they signify." *Id.* When the treating source's opinion "is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given

controlling weight . . . ."  The Commissioner's regulations further provide that the

longer a doctor has treated the claimant, the greater weight the Commissioner will give

his or her medical opinion.  When the doctor has treated the claimant long enough "to

have obtained a longitudinal picture of your impairment, we will give the source's

[opinion] more weight than we would give it if it were from a non-treating source."  20

C.F.R. §404.1527(d)(2)(I).

The Commissioner has issued a policy statement about how to assess treating

sources' medical opinions.  Social Security Ruling 96-2p.  It emphasizes:

1.  A case cannot be decided in reliance on a medical opinion
    without some reasonable support for the opinion.

2.  Controlling weight may be given only in appropriate
    circumstances to medical opinions, *i.e.*, opinions on the
    issue(s) of the nature and severity of an individual's
    impairment(s), from treating sources.

3.  Controlling weight may not be given to a treating source's
    medical opinion unless the opinion is well-supported by
    medically acceptable clinical and laboratory diagnostic
    techniques.

4.  Even if a treating source's medical opinion is well-
    supported, controlling weight may not be given to the
    opinion unless it also is "not inconsistent" with the other
    substantial evidence in the case record.

5.  The judgment whether a treating source's medical opinion is
    well-supported and not inconsistent with the other
    substantial evidence in the case record requires an
    understanding of the clinical signs and laboratory findings
    and what they signify.

6. If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; *i.e.*, it must be adopted.

7. A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator.

Even when the treating source's opinion is not controlling, it may carry sufficient weight to be adopted by the Commissioner:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and labora-tory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weigh-ed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

SSR 96-2p.

The case law is consistent with the principals set out in Social Security Ruling 96-2p. A broad conclusory statement of a treating physician that his patient is disabled is not controlling. *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). For the treating physician's opinion to have controlling weight it must have "sufficient data to support the diagnosis." *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 536, 538 (6th Cir. 1981); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). The Commissioner may reject the treating doctor's opinions when "good reasons are identified for not accepting

them." *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988); 20 C.F.R. § 404.1527(d)(2)("We

will always give good reasons in our notice of determination or decision for the weight

we give your treating source's opinion"); *Wilson v. Commissioner of Social Security,* 378

F.3d 541, 544 (6th Cir. 2004).  Even when the Commissioner determines not to give a

treator's opinion controlling weight, the decision-maker must evaluate the treator's

opinion using the factors set out in 20 C.F.R. § 404.1527(d)(2).  *Wilson*, 378 F.3d at 544;

*Hensley v. Astrue,* 573 F.3d 263, 266 (6th Cir. 2009). There remains a rebuttable

presumption that the treating physician's opinion "is entitled to great deference." *Rogers*

*v. Commissioner of Social Security,* 486 F.3d 234, 242 (6th Cir. 2007); *Hensley*, above. The

Commissioner makes the final decision on the ultimate issue of disability.  *Warner v.*

*Commissioner of Social Security,* 375 F.3d at 390; *Walker v. Secretary of Health & Human*

*Services,* 980 F.2d 1066, 1070 (6th Cir. 1992);  *Duncan v. Secretary of Health and Human*

*Services*, 801 F.2d 847, 855 (6th Cir. 1986); *Harris v. Heckler*, 756 F.2d at 435; *Watkins v.*

*Schweiker*, 667 F.2d 954, 958 n.1 (11th Cir. 1982).

 <u>Treating Doctor: Discussion</u>.  With respect to Dr. Dewar, the administrative law

judge stated:

> On December 18, 2007, Jennifer Dewar, M.D., opined that the claimant can
> walk one city block, sit about two hours per day, 30 minutes at a time,
> stand/walk a total of two hours, 30 minutes at a time. She would need to
> take unscheduled breaks every 30 to 40 minutes, could lift ten pounds
> occasionally, and be absent more than four days per month. Additionally,
> Dr. Dewar states that the claimant is incapable of even "low stress" jobs
> (Exhibit 27F). This opinion is also not supported by the evidence of record,
> either objectively or subjectively. For instance, Dr. Dewar mentions that
> the claimant has multiple tender points. Although the claimant has noted

that she is tender everywhere that is not the same thing as having trigger
points indicative of fibromyalgia. In fact, as previously noted, the
claimant's clinical examinations do not show trigger points. And Dr.
Dewar is also basing her opinion, at least in part, on the claimant's
subjective but not credible symptoms. Therefore, controlling weight
cannot be given to Dr. Dewar's opinion.

(R. 25.)

Substantial evidence supports the administrative law judge's decision to accept
the opinion of Dr. Nusbaum rather than Dr. Dewar. Plaintiff relies on evidence that was
not before the administrative law judge to demonstrate that she had twelve trigger
points. Although the administrative law judge noted that Dr. Dewar wrote that plaintiff
had multiple tender points and discounted her opinion based on the failure to
document the trigger points required for establishing a diagnosis of fibromyalgia, the
administrative law judge concluded that plaintiff's fibromyalgia constituted a severe
impairment. Dr. Dewar's opinion was the result of plaintiff's subjective complaints
rather than objective findings.

The administrative law judge described plaintiff's treatment with Dr. Li:

On July 24, 2006, the claimant was examined by Siyun Li, M.D., a
neurophysiologist. In addition to the numbness, she reported symptoms
of vertigo as well as intermittent double vision. On physical examination
the claimant's blood pressure was 116/76, and heartbeat was regular.
Lungs were clear to ausculation. There were no visual abnormalities, and
motor strength was 5/5. Reflexes, sensory examination, and coordination
were intact. Gait was normal, and Romberg sign was negative. Dr. Li's
impression was basilar migraine.
      Dr. Li saw the claimant for follow-up on January 20, 2007. The
claimant stated that her migraines had responded well to the change in
the medication. There was no change in her clinical examination (Exhibit
20F, pp. 7-8.)

25

(R. 23.) The administrative law judge did not explicitly discuss Dr. Li's February 8, 2007

headaches residual functional capacity questionnaire. Dr. Nusbaum, the medical expert,

discussed the inconsistency of Dr. Li's treatment notes and plaintiff's allegations

concerning the severity of her pain during the hearing. Dr. Nusbaum testified:

> She has a history of dizziness and headaches. Dr. Lee[3], in his evaluation,
> felt she had basilar headaches, and that they were probably linked. She's
> been treated with Topamax. As Counsel pointed out, she had roughly five
> headaches, per Dr. Lee, between January and September of 2007. Her
> testimony is that those last two to three days, and that she's incapacitated.
> There seems to be a disconnect, as far as I am concerned, between that and
> Dr. Lee's description of good control.

(R. 479.) When questioned by plaintiff's counsel, Dr. Nusbaum said that Nolan's

symptoms improved on Topamax and that had she continued to have the more severe

symptoms she initially reported in July 2006, Dr. Li's treatment notes would have so

indicated. Had "that degree of incapacity been present" a neurologist would not have

said there was good control of the headaches. (R. 482.) Dr. Nusbaum testified that

although there was evidence of continuing headaches, they were of "much less

frequency." (R. 484.) Further, if the headaches were severe, Dr. Li would have said so.

Dr. Li's treatment notes from May and September 2007 suggested further improvement

in the headaches and less frequency. *Id.* The administrative law judge adopted Dr.

Nusbaum's opinion:

> Dr. Nusbaum . . . stated . . . the claimant's testimony regarding the
> frequency of her basilar headaches conflicts with that of her physician's
> statement. . . . [A]lthough she has migraine headaches, she has not needed

---

[3]The hearing transcript refers to Dr. Li as "Dr. Lee."

> emergency room treatment or hospitalization for these headaches. . . . [Her
> headaches] have not significantly interfered with her activities of daily
> living.

(R. 23-24.) Following the hearing, plaintiff submitted a medication questionnaire

completed by Dr. Li. *See* R. 397. The administrative law judge did not discuss this

questionnaire in his decision. Because the administrative law judge failed to specifically

address Dr. Li's residual functional capacity assessment (R. 327-32) in addition to the

questionnaire submitted after the hearing but before the decision was entered, this case

this is remanded for consideration of Dr. Li's opinion.

    <u>Credibility Determinations: Controlling Law</u>. Pain is an elusive phenomena.

Ultimately, no one can say with certainty whether another person's subjectively

disabling pain precludes all substantial gainful employment. The Social Security Act

requires that the claimant establish that he is disabled. Under the Act, a "disability" is

defined as "inability to engage in any substantial gainful activity <u>by reason of any</u>

<u>medically determinable or mental impairment</u> which can be expected . . . to last for a

continuous period of not less than 12 months. . . ." 42 U.S.C. §423(d)(1)(A) (emphasis

added).

    Under the provisions of 42 U.S.C. §423(d)(5)(A):

> An individual's statement as to pain or other symptoms shall
> not alone be conclusive evidence of disability as defined in
> this section; there must be medical signs and findings,
> established by medically acceptable clinical or laboratory
> diagnostic techniques, which show the existence of a medical
> impairment that results from anatomical, physiological, or
> psychological abnormalities which could reasonably be

27

expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability. Objective medical evidence of pain or other symptoms established by medically acceptable clinical or other laboratory techniques (for example, deteriorating nerve or muscle tissue) must be considered in reaching a conclusion as to whether the individual is under a disability.

The Commissioner's regulations provide:

(a) *General*. In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. By objective medical evidence, we mean medical signs and laboratory findings as defined in §404.1528(b) and (c). By other evidence, we mean the kinds of evidence described in §§404.1512(b)(2) through (6) and 404.1513(b)(1), (4), and (5) and (e). These include statements or reports from you, your treating or examining physician or psychologist, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work. However, statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the

28

> intensity and persistence of your pain or other symptoms
> which may reasonably be accepted as consistent with the
> medical signs and laboratory findings), would lead to a
> conclusion that you are disabled.  In evaluating the intensity
> and persistence of your symptoms, including pain, we will
> consider all of the available evidence, including your
> medical history, the medical signs and laboratory findings
> and statements about how your symptoms affect you.
> (Section 404.1527 explains how we consider opinions of your
> treating source and other medical opinions on the existence
> and severity of your symptoms, such as pain.)  We will then
> determine the extent to which your alleged functional
> limitations and restrictions due to pain or other symptoms
> can reasonably be accepted as consistent with the medical
> signs and laboratory findings and other evidence to decide
> how your symptoms affect your ability to work.

20 C.F.R. §404.1529(a).

In *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 853 (6th Cir.

1986) the Sixth Circuit established the following test for evaluating complaints of

disabling pain.  First, the Court must determine "whether there is objective medical

evidence of an underlying medical condition."  If so, the Court must then

> examine:  (1) whether objective medical evidence confirms
> the severity of the alleged pain arising from the condition; or
> (2) whether the objectively established medical condition is
> of such a severity that it can reasonably be expected to
> produce the alleged disabling pain.

*Duncan*, 801 F.2d at 853.  Any "credibility determinations with respect to subjective

complaints of pain rest with the ALJ." *Siterlet v. Secretary of Health and Human Services*,

823 F.2d 918, 920 (6th Cir. 1987).

<u>Credibility Determination: Discussion</u>.  The administrative law judge stated:

After considering the evidence of record, I find that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below.

The record as a whole does not substantiate the claimant's allegation of disabling impairment or combination of impairments. As previously discussed, the objective medical evidence does not indicate the presence of an impairment or combination of impairments capable of producing severe, intractable levels of pain, fatigue, or other symptoms that would preclude all work activity. In fact, there are very few positive findings on clinical examinations.

Additionally, although the claimant originally alleged an onset date of October 2003, she worked at substantial gainful activity from October 2003 until May 2004 which date the claimant first amended to, even though she was laid off in May 2004 and did not stop working due to her impairments. Then her representative noted that Dr. Bishop first saw the claimant on April 14, 2005 and April 25, 2005, gave her opinion that would disable the claimant (Exhibit 14F, pp 16-17), and therefore April 21, 2005 should be the "corrected" onset date. The claimant's inability to determine when she became unable to work does not help her credibility regarding her symptomatology.

Furthermore, the claimant has had migraines since age 16 (Exhibit 6F, p. 4) and yet has been able to work. And in January 2007 the claimant reported that her pain is well controlled on the current regiment (Exhibit 19F, p.1). Also, in February 2007 the claimant stated that she was not having any side effects from her medications (Exhibit 20F, p. 3). All of these statements contradict the claimant's testimony regarding debilitating pain and other symptoms.

In fact, in Exhibit 6E the claimant stated that she was having 10 out of 10 pain and fatigue six days out of seven. Yet with pain that severe for that many days, one would think that the claimant would be hospitalized more frequently with intravenous pain medications. And that severe symptomatology is not consistent with the claimant's August 2004 report to her physician that she does all of her activities of daily living (Exhibit 7F, p.3); or with her May 2005 statements that she knits, reads, takes care of two cats, watches television, takes care of her personal needs, takes care of her finances, makes quick meals, cleans, does the laundry, drives, shops, and goes out to lunch once every three months (Exhibit 8E); or with her May 2007 statement that she takes her mother to her mother's doctor

> appointments (Exhibit 21F, p. 6), or with her November 2007 statement
> that she is able to take public transportation (Exhibit 12E). The amount of
> activities in which the claimant has been able to engage is not consistent
> with symptoms so severe that all work activity would be precluded.
> These inconsistencies within the documentary record and the
> claimant's testimony diminish her credibility and do not support a further
> reduction of the established residual functional capacity.

(R. 26-27.) Here, the administrative law judge properly considered plaintiff's prior work history. The administrative law judge noted that plaintiff had been able to work despite the onset of migraines at age 16. Plaintiff acknowledged that she stopped working because she was laid off rather than the onset of a disabling condition. Plaintiff testified that she would have kept working had she not been laid off, and she collected unemployment compensation while continuing to look for work. The administrative law judge's conclusion that plaintiff's allegations of frequent and extreme pain were inconsistent with her lack of treatment and daily activities is supported by substantial evidence in the record.

For the reasons stated above, it is **RECOMMENDED** that this case be **REMANDED** to permit the administrative law judge to consider Dr. Li's opinion.

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto.  28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *Thomas v. Arn*, 474

U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also, Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989).


 s/Mark R.  Abel       
United States Magistrate Judge